## Case No. 13,611.

### SUMNER et al. v. PHILADELPHIA.

[5 Leg. Gaz. 332; 6 Am. Law T. Rep. 476; 18 Int. Rev. Rec. 145; 9 Phila. 408; 30 Leg. Int. 329.] [1]

Circuit Court, E. D. Pennsylvania. Oct. 6, 1873.

HEALTH—QUARANTINE REGULATIONS—OFFICERS—UNREASONABLE DETENTION — LIABILITY OF MUNICIPAL CORPORATION FOR DAMAGES.

1. Quarantine officers may act wisely in detaining an entirely innocent ship, if for any reason, by permitting her to come up, there would be a chance of a panic arising; but it cannot be doubted, that the municipality whose servants took this responsibility would be bound to compensation.

2. The board of health of the city of Philadelphia are ministerial, not judicial, officers. The discretion vested in them as quarantine officers is a reasonable, not an absolute, one; and that whether the detention of a vessel was

---

[1] [30 Leg. Int. 329; 6 Am. Law T. Rep. 476; 9 Phila. 408; 18 Int. Rev. Rec. 143,—contain only partial reports.]

proper or not must be gathered from the facts of the case.

3. The vessel in question having been detained an unreasonable length of time, damages against the city are awarded.

At law.

Henry Flanders and David W. Sellers, for plaintiffs.

George D. Budd and Charles H. T. Collis, City Sol., for defendant.

Report of referee, confirmed October 6th, 1873, by McKENNAN, Circuit Judge:

This is an action on the case brought by the owners of the brig Home against the city of Philadelphia, wherein damages are claimed for the alleged illegal detention of said brig by the board of health at quarantine during the summer and fall of 1870, and other alleged injuries growing out of the same matter. Under an agreement made by counsel, May 21st, 1872, the case was referred to me, with the provision that my opinion and judgment in the case should have the same force and effect as a judgment on a special verdict.

No questions arise for my determination in the pleadings, as it was agreed that any possible objection to the form of action on the one side, or to the giving in evidence of matters of justification under the general issue on the other, should be waived, and the case heard on the merits, irrespectively of the pleadings. Much evidence was produced before me on both sides orally, and depositions taken on behalf of plaintiffs under a commission, were also submitted. The case was ably and carefully argued by Messrs. Henry Flanders, and D. W. Sellers, for plaintiffs, and Messrs. George D. Budd, and C. H. T. Collis, city solicitor, for the city. There was, however, no serious conflict of testimony, though from the necessary circumstances of the case there is some contradiction in the evidence on certain points. Except in one particular, however, these contradictions are unimportant, and I have little difficulty in determining what are the actual facts of the case so far as the history of the transaction is concerned. The determination of some questions, however, which are quasi matters of fact, has been more difficult, involving, as it does, an examination from the scientific testimony, &c., adduced, an investigation into the cause and nature of the infection of yellow fever, especially in the particular epidemic of that disease at the quarantine station in 1870. In determining these matters I have felt some doubt, from the nature of the case, and from the widely varying opinions of medical men on the subject, but I think that it will be found that my conclusions on this question sufficiently approximate the truth for the special matters involved in this case, even if I be in error in some of the general views reached. The questions of law arising upon the facts present still more

difficulty, but my decision of them will be the subject of review, and will be doubtless corrected should I err.

First. As to the facts. The brig Home arrived in the Delaware river about the 26th of June, A. D. 1870, and at the Lazaretto, the quarantine station of the port of Philadelphia, on the 29th of June, 1870. She was a vessel of two hundred and sixteen tons register, hailing from New York,. but arriving from Black river, Jamaica. Her cargo consisted of logwood, but she had besides on board, but not on her register, thirteen bales of sail clippings. These appear to have been the private property of the master. The vessel was then about thirteen years old, built in Nova Scotia, her class No. 2. She had been refitted some three or four months previously, but was in a very filthy condition at the time of her arrival. She had no bill of health. The master, Thomas H. Phillips, had died on board on the 24th June, 1870. Notwithstanding the denials made by the crew, I am entirely satisfied he died of yellow fever, and so decide. The steward had also been sick of the same disease, but had recovered. The crew, at sailing, consisted of nine men, one colored boy, and a passenger from Kingston, Jamaica. Of this number, three— Griffiths, second mate, and Elliott and Pierre, of the crew—were taken down with the yellow fever within a few days of the arrival of the Home at quarantine. Griffiths absconded from quarantine June 30th, the day after his arrival, and died at his home, in Philadelphia, on July 6th. Elliott was taken sick at quarantine on July 2d, and recovered. Pierre was taken sick July 8th, after release from quarantine, and died in the municipal hospital in Philadelphia. Besides, the pilot, Stephen Bennett, who had been five days on the Home (from June 25th to 30th), was taken sick at Wilmington, on his way to the breakwater, July 2d, and died in Philadelphia, whither he came, on July 6th. These cases were, undoubtedly, yellow fever, and were seen and examined by competent physicians, and I cannot see that there can be a possible doubt that in each case the disease was contracted from the Home. This makes it a matter of absolute certainty that she was an infected ship.

By orders of Dr. Thompson, the Lazaretto physician, the vessel was put in quarantine, and, by resolution of the board of health, ordered to be cleaned, fumigated, and disinfected. She took up, at first, a position about four hundred yards from the quarantine landing. The diagrams accompanying the report of the board of health (which was by both sides agreed to be given in evidence) show very satisfactorily the several positions of the vessel. In the disinfection of the vessel, the removal of the cargo was necessary. As the cargo consisted of logwood, which appears to be a substance not capable of retaining or propagating infection, and is so classed in the quarantine laws, hereinafter to be referred to, it was ordered to be unloaded in barges or lighters. About the 11th of July three barges or lighters came down to the Lazaretto, and discharge of cargo commenced. The first lighter (name unknown) received the deck load of logwood, and on July 13th left, without permission, for the city (for the quarantine authorities claimed the right of detaining the lighters also), and came up to the logwood wharf on Windmill Island, opposite the city. No sickness seems to have affected her crew, or to be traceable to this lighter or her crew or cargo. On the 13th or 14th of July the hatches of the vessel were opened for the removal of the cargo, and on the 15th Dr. Thompson permitted her to be brought up to the government wharf, lying somewhat lower down the river than the quarantine wharf, to facilitate unloading. This second position is also well shown by the diagrams attached to the report of the board of health. This government wharf adjoins a government store house, and about one hundred and forty yards to the northwest of it is a public house known as Pepper's. At about four hundred yards, and further to the west, is the house known as Miller's. The quarantine buildings lie some two hundred yards to the northeast of this second position of the Home, and Dr. Thompson's house some hundred and fifty yards from it, in the direct line from the Home to the hospital building. The prevailing wind was from southwest, blowing directly from the Home towards the quarantine buildings.

The Lazaretto had been unhealthy during the spring and early summer; it lies low, and is surrounded in great measure by marsh. There had been unusual overflows also, and, resulting therefrom, considerable malaria, and consequently intermittent fever, mostly of a mild type, had prevailed that season in the vicinity of Lazaretto. Up to this time, however, the yellow fever had been confined, as before mentioned, to the crew and pilot of the brig Home. At this time, however, the disease suddenly appeared among the crews of the barges moored alongside of the brig, the inhabitants of Pepper's House, and of the Lazaretto. This outbreak seems clearly not to have been due to any contagion with the crew of the Home. They had mostly scattered before this, and no case can be traced to contact with either those who themselves had or had not yellow fever. Besides, the general view of medical experts seems to be that yellow fever is not contagious in any degree whatever, and this view, of which the learned Dr. La Roche, recently deceased, was the celebrated exponent, is entirely borne out by all the facts of this epidemic. Nor can this epidemic, in my opinion, be attributed to local causes at the quarantine grounds. The overflows had passed,

and the persons who had suffered from malarious fever, improved; nor is there any evidence of outbreaks of yellow fever in this latitude from any such indigenous cause, except in a few alleged cases in large cities, where there were other distinct elements of foulness and infection apart from mere malaria; even these cases are somewhat doubtful, but granting, as seems indeed probable, that the outbreak of yellow fever in Swanson street in this city in the end of August, 1870, was owing to local causes, no analogy can be found between the condition of Swanson street and the Lazaretto. The Lazaretto is well and carefully and neatly kept, in order and scrupulous cleanliness. The population of the vicinity is in the neighborhood of one hundred souls; and while, from the location, it is liable to ordinary malaria, there is absolutely nothing to render it a place where yellow fever could be generated. But we do not have to look far for the cause of this outbreak of disease. The hatches of the Home were opened about the 13th or 14th of July. By this, the confined, foul, infected air accumulated in the hold of the vessel since it left the West Indies was let loose, and slowly blew and spread over the quarantine grounds and vicinity. The evidence is strong of the distinct, powerful and fetid effluvia perceived by the witnesses to proceed from the brig when passing to leeward of her. The first victims were the persons employed in the barges moored alongside the brig, and who were actually employed in unloading the logwood from the hold. Five out of six of these persons had the fever. These persons also lived and slept on the lighter until removed to quarantine hospital. Next were the inmates of the Pepper House, situated nearest to the second position of the Home, although not directly in the course of the prevailing wind from the vessel, which blew rather directly over quarantine; the earliest taken of this family, however, had been down to see the vessel at the wharf, or had passed directly across the current of air blowing from her on their way to and from quarantine. Lastly, the inmates of the quarantine grounds were attacked. I am entirely satisfied from the evidence that this yellow fever epidemic came entirely from the foul, infected air in the hold of the Home, forced by the prevailing winds on the adjacent shores, and I so decide. This is in entire accordance with Dr. La Roche's view of the usual course of yellow fever infection. The discharge of the cargo was finished July 19th, and the disinfection and cleansing of the vessel was proceeded in, under the direction of the authorities of quarantine. The bundles called "filthy rags" by Dr. Thompson, but which other witnesses speak of as clean sail clippings, were seized by the United States custom house authorities as not in the manifest. They were regarded as dangerous, as having been in the cabin of the captain, who had died of yellow fever, and were therefore burned on the government wharf, by order of the board of health.

The cargo of the brig, as above mentioned, had been discharged into the three barges or lighters above mentioned. One, name unknown, had gone up into the city, and no ill consequences seem to have prevailed among her crew, probably owing to the portion of cargo taken by her being the deck load, and her having left before the opening of the hatches. The other barges the quarantine authorities assumed the right of detaining there were the Kirkpatrick and the Madison. Most of their crews had yellow fever; they were treated at the quarantine hospital; the plaintiffs were obliged to pay their board, &c., at the hospital; also demurrage, &c., to the owners of the lighters; to recover these amounts is part of plaintiffs' claim.

While this epidemic was running its fatal course at the Lazaretto, the cause of the infection—the Home—had been under Dr. Thompson's, the Lazaretto physician's, directions, cleansed and fumigated. This, of course, could not be done until discharge of cargo. From the nineteenth July, the date of the accomplishment of this, until August 4th, when, by a mistake as to the orders of the board of health, she was permitted to come up to the city, covers therefore a period of some fifteen days for her disinfection.

We now come to the circumstance of the release of the brig Home, and of her being permitted to come up to Philadelphia, and then sent back to Lazaretto by the board of health. This seemed, at the first blush, a very important element in the case; but, as will be seen from the light afterwards thrown upon it, has not materially affected my decision. I am entirely satisfied that this permission of the vessel to come up was an error on the part of the quarantine officers, based on a supposed order of the board of health which had no real existence. The minutes of the board of health make it clear there was no such order. Both the quarantine master, Gartside, and Dr. Thompson, were then sick, and died shortly afterwards of the fever. One of them said, or was understood to say, that an order had come down. From their illness, and the confusion at quarantine caused by the ravages of the fever, no search was made for the order; but Dr. Taylor, who had just come down to take charge, permitted her to go up. Whether an order for the release of one of the barges was mistaken for an order to release the brig, or whether the mistake occurred from the commencement of the delirium of the fever, seems doubtful, but there can be no doubt it was a mere mistake. When she reached Windmill Island, August 5th, 1870, the board of health ordered her immediate return to quarantine. The consignees and captain of the vessel declined to do this, and the board of health, by John E. Addicks, the health officer, took possession of the Home, and took her back to quarantine on August

8th, 1870. Here she was anchored at a point somewhat higher up the river than the Lazaretto, and well out in the stream. The consignees and master threatened and spoke of abandonment in consequence of this seizure, but certainly, as a matter of fact, no abandonment took place, for somewhat later the consignees sent a watchman down to the vessel, and afterwards a second watchman. After her return to quarantine, the vessel seems to have been again whitewashed, and her pumps cleansed with carbolic acid. The yellow fever prevailed for some short time longer at quarantine, but in its new position no infection can be traced to the Home, except one case hereafter to be mentioned. No infection seems traceable to her while at Windmill Island, but all the evidence is that the outbreak of yellow fever in Swanson street, in the latter part of August, was entirely sporadic. When the Home first moved down to her new position above the Lazaretto, she was in charge of two men placed on board by the board of health. Kugler testifies that both these men, Smith and Wilson, were sick, but neither appears to have had distinctively yellow fever. Mr. Addicks attributes this to their not being allowed to go below deck. The watchman sent down by consignees succeeded them about August 18th, when they became sick. About the same time a man named Carpenter, a new nurse at the Lazaretto, was sent aboard to help pump; he was taken with yellow fever; but his disease may have been contracted possibly from a new focus of infection at the Lazaretto, which Dr. Taylor thinks was established there, by the number of cases there treated and not from the Home. While in the charge of the watchman sent by the consignees, the Home was robbed. She had, besides her own ropes, &c., a great deal of extra hawser and some extra canvas. All this was stolen. How the robbery occurred seems doubtful. We have a second-hand account given to Kugler by the watchman, that he had been violently boarded up in the cabin by the robbers. In any event, this watchman was promptly discharged by Cook, the captain of the Home, and a new one employed. For this loss the plaintiffs claim damages. As to the condition of the vessel when returned to Lazaretto, there seems some conflict of testimony. Dr. Taylor thinks she had ceased to be an infecting cause, though prudence demanded her longer detention; but Dr. Goodman perceived a peculiar odor from her hold, and considered her not clean. On the whole, I am not satisfied that she was on the 4th or 8th of August properly cleansed and disinfected. In fact there had been up to that time but some fifteen days from the discharge of her cargo to clean her.

The Home was then detained at quarantine, in spite of repeated appeals for her release, until November 2d, when her discharge was ordered,—nearly three months. She was at last released, November 7th. When this occurred she was found to have sustained serious damage from opening of seams, &c., from exposure to the sun, which necessitated recaulking. It was in evidence that this might have been prevented by constant washing of the deck or by spreading tarpaulins. There was no evidence before me as to how much of this damage occurred prior to, and how much after, August 4th, the date prior to which plaintiffs admitted the detention to be lawful, and there was no satisfactory evidence as to the condition of the vessel in this respect on her arrival. Kugler, the steward, describes her as very rusty when she reached quarantine. During the whole period of the detention the plaintiffs engaged a new master, Captain James Cook, who remained in Philadelphia, urging her release, and making daily visits to quarantine to see after the vessel; for his wages and expenses here plaintiffs claim to recover, as also for Mr. Currier's expenses in a journey to Philadelphia to see after his brig. During her entire detention application seems to have been made almost daily for her release, and no definite refusal given or period fixed, but the plaintiffs seem to have been in constant expectation of an immediate liberation during all this time. During this period an application was made by plaintiffs for permission to take the vessel up to Port Richmond, load her with coal, and then take her north, the plaintiffs pledging themselves not to stop at the city or to delay the loading. This application was made formally in writing, and was met with a verbal refusal. Mr. Currier testifies that he then applied for permission to take in coal or ballast from lighters at the Lazaretto and sail north. This request appears to have been verbal and informal, and was informally refused, Mr. Currier says. Mr. Steele, the chairman of the Lazaretto committee, does not remember this request, and thinks such an application as the last mentioned would have been granted. But I thing the weight of the evidence is that such an application was made, and either refused, or, more probably, neglected. As before mentioned, before the vessel was finally released, the owners were compelled to pay bills for hospital, &c., for lighters, crews, watchmen, provisions, towage of vessel to Windmill Island, &c., for which, as paid under compulsion, plaintiffs claim to recover.

This closes the history of the facts. With regard to the application of the law to them, it may first be premised that it seems undisputed that the board of health are the servants of the city of Philadelphia, entrusted by acts of 1854 [Laws Pa. 1854, p. 305] and 1855 [Laws Pa. 1855, pp. 89, 391] with the same functions as by the acts of 1818, &c., the former independent board of health had. The act of 1859 [Laws Pa. 1859, 400], making the board nonelective, makes no change in its relations to the city. There is therefore no question but that the action is well brought against the city of Philadel-

phia, and if the old board as a body politic would have been liable, the defendants are liable here. On the other hand, there is no allegation of malice, or corruption, or improper motive, against the board of health, and if they have erred they have done so honestly. Further, a decision in plaintiffs' favor by no means implies that the board of health have not on the whole acted wisely and for the public good. Public officers must often take the responsibility of acting outside of law in cases of emergency, and their action may cause private injuries, which require compensation in damages, and yet their action may be highly commendable in a public point of view. The blowing up of buildings to stop conflagrations, and many other takings of private property for public use, are familiar illustrations of this; and it can well be conceived that in view of the excitability of the public mind, and the panic that readily arises on any apprehension of the approach of pestilence, quarantine officers might act wisely in detaining an entirely innocent ship, if for any reason, by permitting her to come up, there would be a chance of panic arising; but it cannot be doubted in any such case, the municipality whose servants took this responsibility would be bound to compensation.

It was contended, however, for the city, that under the act of June 29, 1818 (City Digest, pp. 19, 20), the board of health have an unlimited discretion in all cases where their jurisdiction attaches (as it cannot be fairly disputed it did to the Home in this case); that the words of the act, "shall be detained such further time as the board of health may deem necessary," gave them an absolute discretion in the matter, for an abuse of which they would be individually liable, but the city in no event responsible. The counsel for defendants also argued, by way of illustration, that the board of health could not be restrained by injunction from detaining a vessel. No authority was cited to sustain this position, and in my view it is untenable. The board of health are ministerial, not judicial, officers; and, as well argued by counsel for plaintiffs, the analogy to this case is truly found in those cases in which powers are given to municipal bodies with responsibility for its mode of exercise —avoidable damage requiring compensation; such as Commissioners of Kensington v. Wood, 10 Barr [10 Pa. St.] 95, an action for damages resulting from the grading and paving of Penn street, because the arrangement of level caused a flow of water on plaintiff's premises; Erie City v. Schwingle, 10 Harris [22 Pa. St.] 385; Commissioners, etc., of Northern Liberties v. Northern Liberties Gas Co., 2 Jones [12 Pa. St.] 318; Pittsburgh v. Grier, 10 Harris [22 Pa. St.] 65.

Were these quarantine authorities the servants of the commonwealth, they would be personally responsible for injuries to private property, but, being the servants of a municipality, that body is liable for their acts. If the doctrine of eminent domain or the right of taking property for public use is called in to justify defendants, it requires, in all such cases, compensation; and their being no special method of obtaining redress prescribed, a common law action in the case is appropriate. As counsel for the plaintiff very ably argued, if it is claimed that the act authorizes without compensation, the detention of vessels or taking of property (which such detention clearly amounts to), further than the necessity of quarantine requires, just so far would the act be unconstitutional, as taking private property for public use without compensation. No such construction, however, should be put on the law, for it is clear to me it is intended to authorize a detention, so long as it shall reasonably be deemed necessary. See U. S. v. Russell, 13 Wall. [80 U. S.] 628; Bishop v. Mayor, 7 Ga. 200.

Quarantine proper, the detention of a foul or infected vessel, and the proper disinfection and cleaning of her, is eminently beneficial for the individual trader, as well as for the public. But if we go beyond this, and allow that the quarantine officers should have an absolute discretion, not subject to revision or responsibility save in case of misfeasance, there is strong danger of the rights of the individual being sacrificed to an imagined public necessity. The trader would be placed in a most unhappy position, and there would be practically no restraint upon the most arbitrary and unreasonable detentions. Nor would this construction be even beneficial to the defendants. It would certainly be far better for the city's commerce to have it known that though in certain cases, where suspicion existed, vessels would be detained at quarantine, yet, in all cases where injustice was done, it would be compensated, than for vessel owners to be under apprehension of an arbitrary and unlimited detention by an irresponsible board. I decide, therefore, that the discretion vested in the board of health is a reasonable, not an absolute, one, and that we must, upon the evidence, judge whether or not the detention was in fact proper, or rather when, if at any time, it ceased to be so.

Now, to apply my conclusions as to the law, to the facts as I have ascertained them.

First. I am entirely clear that plaintiffs are entitled to recovery for the detection of the lighters and every expense resulting to them from this detention; also, for the board, &c., of the crews of the lighters at the quarantine hospital, which they were compelled to pay. The act of assembly gives no right whatever to detain lighters, even if infected. The learned counsel for the city endeavored to show that the lighter coming down to Lazaretto from the city, and

proposing to return, should be treated as a "vessel from a domestic port"; but this is certainly a very strained construction, and by examining the act on the question of discharge of cargo, it is easy to see the meaning. It is provided that if the cargo be of a nature not capable of retaining infection, "it may be conveyed immediately to the city in lighters." Logwood is included in dye-wood, and is defined in the act as non-infectious. Now, under this act, it was either absolutely the duty of the board of health, if the act be mandatory, to allow the logwood constituting the cargo to be transferred to the city in lighters, or, if the words are permissive merely, they might have refused to allow the cargo to be placed in lighters, and ordered it to be unloaded on the dock at the Lazaretto. But when it once was in the lighters, they had lost their entire control of it, and of the lighters, it is hard to see how they ever acquired jurisdiction. I must, therefore, treat the detention as entirely unauthorized, and allow the plaintiffs' claim for demurrage paid by them to the owners of the barges; there is no reason to suppose that this is more than was justly due, and having been actually paid by plaintiffs, the onus was on defendant to show that it was excessive, which has not been done. In deciding that this detention of the lighters was unauthorized, I must not be understood as condemning the action of the board of health in the matter. Although the evidence is strongly preponderating that yellow fever is not contagious in any degree, and that the cargo discharged in the lighters was non-infectious, yet, in view of the illness and death of so many of the lighter's crew, and of the unreasoning panic which might have prevailed had these barges with their crews, sickening from the infectious wind blowing from the Home, to which they had been exposed, come up to the city, I am not prepared to say that the board did not act wisely in detaining them; but then this must clearly be allowed for as a taking of private property for public use, and compensatory damages given to the plaintiffs. As to the expenses of the crews of the lighters, it is not denied the plaintiffs were compelled to pay these bills before the vessel was released. The case, therefore, stands as if the city were suing the owners of the Home for the board, expenses, &c., of the crews of these lighters at quarantine hospital; this claim would be for damages of the most indirect character. There certainly is no obligation of the kind implied in the chartering a lighter, and if the city can make the owners of the Home pay for the nursing, &c., of these men because they caught yellow fever while unloading her, it is hard to see why an infected vessel should not be bound for every damage or injury which could result to any one whom the disease might attack. This could not be set up unless it was held that owners of vessels who were so unfortunate as to have been attacked by disease became thereby tort feasors if their ships were brought into port. Even if the men themselves could have sued the owners of the Home for damages, it could not be argued that the action could be maintained by a hotelkeeper, with whom a person who had caught the infection had lodged, and who had not paid his board. I must, therefore, allow this claim as presented by plaintiffs. The sixth section of the act of 1818, allowing claim for expenses, clearly only applied to the crew of the vessel. Of course, the bills the plaintiffs were compelled to pay for provisions supplied to the lighters by the board of health, during the detention, must follow the same rule, the detention being unlawful. Counsel for the city stated also, and one of the witnesses, Mr. Steele, testified that the city had sustained great damage from the epidemic of yellow fever at the Lazaretto, contracted from the Home, but it seems rather thrown in as a make-weight than intended to be set up as a set-off to plaintiffs' claim, and, in fact, was too indefinite in shape to call for any decision from me upon it. And in no event could such a claim be maintained. Disease must, unless under very exceptional circumstances, be viewed in law as the act of God; and, when a vessel so unfortunate as to be infected comes to a quarantine station, she comes just where she ought to come. A claim could as well be maintained by a hospital for damages by reason of its nurses, &c., contracting disease from a patient.

I have stated already that from the evidence I am satisfied that the release of the brig Home on August 4th was a mistake merely, and is to be simply treated as such, and ought not to prejudice the defendant's rights. It is clear, however, that as it was a mistake solely of the city's officers, the expenses directly incurred by plaintiffs in consequence thereof must be refunded. These are the expenses of towage of the vessel to the city paid by plaintiffs, and the expenses of towage back to Lazaretto, which plaintiffs were, to procure the release of the vessel, compelled to refund the city. I therefore allow to the plaintiffs these amounts as claimed.

To return now to the main question, as to the plaintiffs' claim for damages for the detention of their vessel after August 4th, I have stated my view, that this is to be decided on its merits; that the board of health are ministerial, not judicial, officers; and that their discretion is a reasonable, and not an absolute, one; but as to the fact whether the detention of the vessel after August 4th was reasonable. I cannot go so far as plaintiffs claim. I concede to plaintiffs that the detention of vessels must be for cleansing, and that a detention for a longer period than is required for the proper purification of a vessel and a reasonable period of delay to

test the fact of her being clean would not be justifiable; but I am not prepared to say that a period of three weeks can be laid down as a limit within which vessels must be cleansed, nor will the custom of other ports have any but an indirect bearing on this point. The evidence shows that the time required for purification depends upon the age and condition of the vessel; that a ship as old and filthy as the Home required a long period to clean, and probably could never be pronounced absolutely clean; her purification would be but relative at best. Then there were actually but fifteen days from the discharge of her cargo until her mistaken release on August 4th. There is also positive evidence (Dr. Goodman's) that she was not a clean, unoffending vessel on her return to Lazaretto, August 8th, and there are further several doubtful cases of sickness arising after that time, and one clear case of yellow fever, that of Carpenter, who was taken sick August 18th, but who may have contracted the disease at quarantine. I must, therefore, decline to consider the Home as entitled to be released August 4th, and her detention, thereafter, unlawful. This detention actually lasted, however, up to November 7th. The resolution was passed November 2d, but she was detained until the bills were paid, November 7th, a period of nearly three months. Now, on the same principle, I am bound to decide that the detention of the Home during so long a period was unnecessary as an unreasonable exercise of discretion, and therefore unlawful, and to be compensated in damages. In fact, it does not appear that any real danger could have been apprehended from the Home for so long a period, certainly nothing was done to cleanse her after the whitewashing, &c., done when she first came back to the Lazaretto. Her detention would seem rather to have been a matter of policy, that inasmuch as she was publicly known as infected with yellow fever, it was more prudent not to permit her up until, from the lateness of the season and the disappearance of the Swanson street epidemic (which, as before mentioned, was proved to have arisen from sources unknown, but entirely distinct from any traceable to the Home), in the end of September, the public fear of yellow fever had died away. In fact, Dr. La Roche says, in his report on the yellow fever in 1870 (page 23): "She was, though apparently clean and disinfected, as a matter of precaution, ordered back to the quarantine station, where she was taken by the health officers, and remained at a proper distance from the buildings and under strict surveillance till the close of the quarantine season, when she was released."

Now, it must be conceded that, however wise, as a matter of public policy, it may have been to detain a clean vessel, yet such a detention cannot, as regards the owners of the vessel, be treated as a reasonable one within quarantine powers, but must be treated as a taking for public use, for which compensation is due. On evidence given before me, I have considered that the detention for a period beyond August 8th was justifiable, and it is somewhat hard to fix a point where, in this view, it ceased to be so. Allowing, however, a week after the return to Lazaretto, for a fresh cleansing, and some two weeks longer for a reasonable delay to test her condition, I think it may fairly be said that on the 2d of September she should have been released. If Carpenter's and the other reputed slight cases were due to infection from the brig, they would seem, from their appearing from 15th to 18th, to have been contracted from 8th to 12th, the time she was being whitewashed and having pumps cleaned. This would make two weeks delay from 18th appear reasonable. I therefore allow the claim for demurrage from September 2d, until her release, November 7th, including the five days during which she was detained, after the order for her release was given, to compel the payment of the bills which I have decided were not justly due. This decision makes it unnecessary for me to discuss at length the question of the liability of defendants for demurrage, &c., during the period from refusal of the board of health to permit her to take·in ballast from lighters at Lazaretto; but I am clear that on this ground, also, I must award the plaintiffs demurrage, &c., from the date of the application. The words of the act, on this point, are: "Provided, that such ship or vessel, after she shall have been thoroughly cleansed and purified, if no malignant disease appear on board, may be allowed to take in freight at the Lazaretto by means of lighters, and proceed to sea." From their connection, following the clause that the vessel shall be detained to such further time as the board deem necessary, I am disposed to consider this proviso as mandatory, and as giving the vessel this as a privilege or right.

As I have held in my review of the evidence, I am satisfied that Mr. Currier made the request to members of the board verbally, and was verbally refused. There is nothing in the act to require a formal written application. The request which Mr. Currier made formally was informally refused; he was simply told that the board would not consent, and there does not appear any formal entry of this refusal even on their minutes. Mr. Currier does not seem to have received any intimation that, to secure this permission, he should make formal application in writing. The other application, to go up to Port Richmond to take in coal, and go immediately to sea, would seem to have been a sufficiently reasonable one, in view of the "apparently clean condition" of the vessel in the end of August or beginning of September, but was not within the peremptory words of the act; in any event, had a formal reply been made to this letter by the board of health, offering permission for the

brig to be loaded from lighters at the Lazaretto, the city would have been freed from liability on this ground. The period of this request and refusal is not definitely ascertained, but it is not far, I think, from September 1st, so that I think I am, on this ground, also right in fixing that as a period for the beginning the allowance of demurrage.

The view I have taken of the detention with regard to the claims for demurrage applies with the same force to expenses necessarily incurred by plaintiffs in care of their vessel during the same period. I therefore allow their claim for the wages and support of watchman from September 2d; also for captain's wages and board. Some question was made as to the captain's rate of board at Arch Street House being too high, but no evidence was offered in support of this point, and it was shown that it is a usual place for masters of vessels to stop. I can see no reason why the expenses of the master's trips to and from Lazaretto to Philadelphia during the same period should not be allowed; it was necessary he should be, from time to time, in both places, to see after the vessel at Lazaretto, and to urge her release with the health officer and board of health here. From much of these charges the board of health could have freed themselves, had they made up their mind how long the vessel was to be detained. Had they told the owners in the end of August, the vessel must remain two months longer, the master's board and wages during those two months, and his traveling expenses might have been saved. The claim for expenses of owners coming to the city in August and November is not allowed. I have held that in August the vessel was rightly detained, and Mr. Currier's journey in November was induced by her release, not by her detention, and there is no evidence he would not have come on at whatever time she was released. Besides, the city is already charged with a master's wages expressly engaged to look after the vessel. No evidence was given to support the claim for "commission, $38," and it is disallowed.

Three points remain still open. The claim for value of rags destroyed on the government wharf; the claim for sails, rope, &c., stolen; and the claim for damages to the vessel from exposure to sun.

First, as to the rags. I must disallow this claim on several grounds: First, the rags appear not to have belonged to the owners of the vessel, but to have been the private property of the deceased Captain Phillips. Secondly, they were seized by the United States custom house officers as not on the manifest, and even if they had not been on this ground confiscated, they were subject to a duty of an amount, not shown in evidence, which might have absorbed their value. The evidence is doubtful as to their character; some witnesses called them clean clippings; Dr. Thompson, filthy rags. Rags are materials capable of retaining infection, and almost impossible to disinfect. Dr. Thompson considered their destruction necessary, and although there is no provision in the act of assembly for the destruction of infected articles, yet I think it cannot be maintained that infected rags would have any value, so that damages could be obtained for their destruction. Dr. Thompson considered them infected, and they had been certainly in the cabin of the captain, who had died of yellow fever.

Second, as to the robbery of the sails, hawsers, &c. The plaintiffs' claim is for an amount of upwards of twelve hundred dollars expended to replace the lost articles, &c. This amount would seem, in any event, somewhat too large, as not making sufficient allowance for the probably deteriorated condition of the articles stolen; but as I propose to reject the claim, it is unnecessary for me to go into that question. I am entirely satisfied that there was no abandonment. It is true that the consignees and master threatened to abandon when the board of health sent the brig back to quarantine; but it clearly appears that this intention was reconsidered, and never carried into effect, since, at the notification of the board of health, the consignees sent down a watchman to take care of the brig. That the facts on which my conclusion that there was no abandonment is based may clearly appear, I insert, as requested, copies of the resolution of the board of health as to the request to the consignees to send a watchman, and of the notice sent to the consignees by Mr. Addicks, the health officer.

The resolution was as follows: "Resolved, that the health officer be directed to notify the consignees of the brig Home that he returned her safely to the Lazaretto on Saturday night; that she is there at their risk; and that they be requested to send a person or persons to take care of and watch her, in lieu of two men stationed on board by the health officer for that purpose." Passed August 9th, 1870.

The letter of Mr. Addicks is as follows: "Philadelphia, August 9, 1870. Messrs. Knight & Son, No. 120 North Delaware Avenue—Gentlemen: As consignees of brig Home, I hereby inform you, as I told you on Saturday, the 6th inst., at the custom house, that on that day I had received from the board of health instructions to have the brig taken to the Lazaretto forthwith; both you and the captain declined to obey my order to do so. I found the brig at east side of Windmill Island, abandoned. I placed a pilot and four men aboard, and towed her down to the Lazaretto, at which place she was anchored at about 9 o'clock, p. m. I further placed two men aboard as watchmen. All the expenses incurred are charged to you and the owners of the brig Home.

I now further notify you, by direction of the board of health, that you send down at once proper persons to take charge of the vessel, as she now remains at the Lazaretto at your risk, or all persons concerned as her owners. Respectfully, John E. Addicks, Health Officer."

The watchman was sent down, in compliance with this letter. This act seems to me distinctly a waiver of the threatened abandonment, and a resumption of charge of the brig. It was during the period while the brig was under the care of this man, sent by the consignees, and after the departure of the two men placed on board by the health officer, that the loss occurred. The manner of its occurrence is certainly doubtful; the watchman related that he had been forcibly boarded up in the cabin while the vessel was robbed; the captain engaged by the owners, Cook, however, concluded to remove him, and replace him by another, immediately upon the loss occurring; this would certainly argue that he thought there had been at least negligence on the part of this watchman. There was no reason to doubt that the owners might have placed additional force on board the vessel for its protection, if they desired; in fact, they were notified to send a person or persons, and it was well argued for the city that as the owners employed a master and one watchman, with whose wages and expenses they charge the city, it was for them to employ also such other servants as to make their property secure. On the other hand, counsel for plaintiffs contended that the rule of quarantine forbidding persons going on board the brig from coming to Philadelphia rendered it impossible for the consignees or master to visit the brig and ascertain what was necessary; that it was the act of the board of health placing the brig in this situation, and it was their duty therefore to see she was properly protected. They sought also to apply the analogy of tow-boat cases, where the tug, having the guidance and direction, is made responsible to the towed for accidents befalling them. It seems to me this analogy is unsound, because in this case there was not, in fact, an absolute resignation or giving up the management of the brig to the board of health by its owners; on the contrary, a certain care and superintendence of it was still taken by them; to make the analogy apply, the injury to the towed vessel would have to be by robbery or something similar, which its own crew might fairly be expected to provide against. It seems to me, on the whole, a case of concurrent negligence. Without denying that perhaps the negligence of the board of health was greater than that of plaintiffs, since they were acquainted with the state of the river as to police, &c., and should have made proper provision for the protection of vessels detained by them, yet I cannot but impute some negligence to plaintiffs, through their servants and agents, the consignees and master and watchman—First, in plaintiffs' injudicious choice of a watchman; second, in not sending a sufficient number of watchmen to properly protect their vessel, or applying for leave to send them; third, in the watchman, in negligently keeping his watch and suffering himself to be boarded up in the cabin while the brig was robbed. In this I may be in error, but the master was certainly of this opinion, since he dismissed the watchman. Were this case in admiralty, the rules of maritime law would compel an apportionment of the damage according to the degree of negligence proved against each party; but as it is in a common law court, contributory negligence shown in the plaintiffs precludes their recovery. I believe the robbery occurred during the period when I have considered the detention justifiable; but that does not alter the position of the parties in this particular, since, though defendants would, if the detention were unjustifiable at the time of loss, be held to a stricter rule of diligence, yet, in either event, in an action on the case contributory negligence on the part of plaintiffs conducing to the loss would prevent their recovery. The plaintiffs' claim for reimbursement for the loss of the sails and hawsers must, therefore, be disallowed. No proof was given for the item 28, bending sails, and I do not see how it could be allowed if proved.

The remaining claim is for damage to the vessel by the opening of the seams, by reason of exposure to the sun at quarantine, which necessitated recaulking, at an expense of $200. There was a further claim for $47.35 for damage to the boat, which, however, was excluded, as not being shown in any way to be the consequence of the detention. It was contended against the allowance of the claim for caulking, that this damage could have been prevented by frequent washing of the decks or spreading of tarpaulins. The first was impossible, without there had been a larger force on board, and the second became impracticable after the sails were stolen. Besides, the rule of the quarantine, which prevented the master from visiting the vessel, rendered it impossible for him to judge properly what ought to be done to guard against this evil, and a watchman, sent down from the city, would probably be ignorant of what measures were necessary for the purpose; and if a larger force had been employed on board the vessel, the wages and expenses I would have allowed them would probably have been as much as this claim for scraping and caulking. It is more difficult to say how much should be allowed, and to adjust the amount of injury of this kind, due to the detention I have held unlawful. On the whole, I decide to allow half the amount claimed, or $100, treating the rest of the injury as resulting during the voyage and the lawful detention. To sum up, therefore, I award the plaintiffs:

Bill of expenses to get the vessel back
to Lazaretto ................... $    62  50
Hospital, T. White .............        7  75
    "     T. Doggett ...........        5  00
Watchman, 66 days, September 2d to
November 7th, at $1.50..........       99  00
Proportion of provisions bill for
watchman ....................          34  83
Hospital, Elliott and Sylvester......  14  80
    "    Carpenter and Houghton..      39  06
    "    Thomas Doggett, Jane
         Doggett ...............       27  00
Towage to the city $15, labor 4 men
$16.80 .......................          31  80
Captain's wages. from September 2d
to November 7th, 2 months and 5
days, at $80..................         173  66
Board of captain, 9½ weeks, at $12..   114  00
Travelling expenses, proportion, say
two-thirds ....................         13  96
Demurrage from September 2d to
November 7th, 2 months and 5
days, on 216 tons, at $2.50 per ton
per month ....................       1,170  00
Amount paid owners of lighters for
demurrage of barges............        384  00
Caulking ......................        100  00
                                    ──────────
                                     $2,273  36

Interest from November 7th, 1870, is al-
lowed on this amount.

I presume that costs follow the report.
These I compute as follows:

Attorney fee and writ............. $   22  40
Clerk .........................         7  25
Crier .........................         1  00
Commission ....................         6  00
Certificate of record to referee.......  10  00
Referee's fee, as suggested by counsel..  250  00
Printing report ................        49  70
                                    ──────────
                                      $346  35

R. L. Ashhurst, Referee.